**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DANIEL MIKE CHAVEZ,
*Plaintiff-Appellant*,

v.

DAVID R. ROBINSON; LISA
MOORE,
*Defendants-Appellees.*

No. 18-36083

D.C. No.
1:11-cv-03025-AA

OPINION

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, District Judge, Presiding

Argued and Submitted May 22, 2020
San Francisco, California

Filed September 8, 2021

Before: Marsha S. Berzon and Sandra S. Ikuta, Circuit
Judges, and Ivan L.R. Lemelle,[*] District Judge.

Opinion by Judge Ikuta;
Partial Concurrence and Partial Dissent by Judge Berzon

---

[*] The Honorable Ivan L.R. Lemelle, United States District Judge for the Eastern District of Louisiana, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel affirmed the district court's dismissal of a complaint brought pursuant to 42 U.S.C. § 1983 by Daniel Chavez alleging that his constitutional rights were violated when, as a condition of his supervised release and while his appeal of his conviction was pending, he was required to complete a sex offender treatment program, and then was discharged from the program and given a limited jail sanction for refusing to admit to the conduct underlying his conviction, a required part of his treatment.

Chavez brought suit for damages against his probation officer and the director of the therapy program alleging defendants violated his rights under the Fifth Amendment and Fourteenth Amendment by requiring him to admit to the conduct underlying his conviction; violated his Sixth Amendment right to counsel; and violated his First Amendment right to free speech by dismissing him from treatment after he filed the pending lawsuit.

Addressing Chavez's claim that defendants violated his Fifth Amendment right against self-incrimination, the panel stated that the claim required consideration of the distinction between the core constitutional right protected by the Self-Incrimination Clause and the prophylactic rules designed to safeguard that right. The panel held that it was bound by the rule adopted by six justices in *Chavez v. Martinez*, 538 U.S.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

760, 770 (2003) (plurality opinion), as enunciated in this court's precedent, and consistent with the rule adopted by sister circuits—that the Fifth Amendment is not violated unless and until allegedly coerced statements are used against a suspect in a criminal case. Because Chavez did not make a statement that was used in a criminal proceeding, he could not bring a civil action against the government under § 1983 for a violation of his Fifth Amendment right against self-incrimination. Thus, the panel held that Chavez's claim was based on a violation of the judge-made protection from being forced to give incriminating testimony. Because this privilege is a prophylactic rule designed to safeguard the core constitutional right protected by the Self-Incrimination Clause rather than the core constitutional right itself, Chavez could use the privilege only defensively as a shield and could not wield it as a sword in an action for damages.

Addressing defendants' contention that they were entitled to qualified immunity as to the Fifth Amendment claim, the panel stated that the analysis raised some close questions. The panel noted that under *United States v. Antelope*, 395 F.3d 1128, 1139 (9th Cir. 2005), state officials may not impose sanctions on a sex offender for failure to make incriminating statements as part of a treatment program, where the officials expressly decline to offer immunity and insist that a sex offender's statements can be used in subsequent criminal proceedings. In *Antelope*, the court reversed the revocation of a sex offender's supervised release. Rather than decide whether *Antelope* clearly established a rule that applied to defendants in this somewhat different context, the panel deemed it prudent to rely on its holding that Chavez's Fifth Amendment claim could not proceed in the absence of the use of a coerced statement in a criminal

proceeding, and so the panel did not reach the second prong of the qualified immunity analysis.

The panel next rejected Chavez's claim that defendants violated his Sixth Amendment rights by denying him counsel at a critical stage. Chavez argued that defendants' refusal to allow him to consult his attorney before making admissions was in effect a complete deprivation of counsel at the critical stage of determining whether to appeal or withdraw an appeal. The panel held that even assuming that a decision to withdraw an appeal is a critical stage, Chavez was not denied access to counsel for that purpose. Nor did any precedent support Chavez's argument that his meeting with defendant Robinson for sex therapy treatment was a critical stage of his appeal. Moreover, the panel stated that this court's precedent made clear that the Sixth Amendment has no application to supervised release proceedings. Because no existing precedent established that a prisoner who is prevented from contacting counsel during sex offender treatment has been denied counsel on appeal, defendants were also entitled to qualified immunity on this claim under the second prong of the qualified immunity analysis. Finally, the panel held that Chavez had not identified any case holding that a convicted sex offender participating in a treatment program as a condition of probation or supervised release is entitled to counsel before complying with the requirement (typical of such programs) to admit the conduct underlying the conviction, even if such admission has the potential to prejudice a potential retrial after a successful appeal. Accordingly, defendants were entitled to qualified immunity on the Sixth Amendment right to counsel claim.

Addressing Chavez's claim that defendants violated his First Amendment right by terminating him from the sex

offender treatment program and revoking his supervision in retaliation for his lawsuit, the panel held that defendants were entitled to qualified immunity. Chavez cited no case holding that a person providing rehabilitation therapy for a supervised releasee may not discharge the releasee from the program in response to a lawsuit.

Concurring in part in the judgment and dissenting in part, Judge Berzon stated that Chavez was compelled in a criminal case to be a witness against himself and imprisoned because he would not be, violating his Fifth Amendment rights and giving rise to a cause of action under § 1983. On the record viewed most favorably to Chavez, defendants violated a well-established prohibition on incarcerating a parolee for failing to incriminate himself, recognized in *Antelope*, 395 F.3d at 1139; Chavez could sue for damages under § 1983 for that violation; and Chavez's Fifth and Fourteenth Amendment claim was not barred by qualified immunity. Judge Berzon therefore dissented from the majority's Fifth Amendment § 1983 holding.

Judge Berzon also wrote separately to address the majority's reasoning on Chavez's Sixth Amendment claim. To the extent the majority reached the merits (which was not clear), she disagreed with the majority's assertion that Chavez's Sixth Amendment claim failed because he had access to counsel at other stages of his appeal and because the Sixth Amendment did not apply to supervised release proceedings. These arguments mischaracterized Chavez's claim: that he had a right to consult with counsel about waiving his Fifth Amendment privilege while his appeal was still pending. Judge Berzon agreed, however, that there was no clearly established law on whether Chavez had a right to consult with counsel under the circumstances, and so

concurred in holding that Chavez's Sixth Amendment claim was barred by qualified immunity.

## COUNSEL

Gus Tupper (argued), Kara Gordon, and Eleanor Walker, Certified Law Students; Charles D. Weisselberg (argued) and William H.D. Fernholz, Supervising Attorneys; University of California School of Law, Berkeley, California; for Plaintiff-Appellant.

Beth A. Jones (argued), Certified Law Student; Gerald L. Warren (argued), Supervising Attorney; Law Office of Gerald L. Warren and Associates, Salem, Oregon; for Defendants-Appellees.

## OPINION

IKUTA, Circuit Judge:

As a condition of his supervised release, Daniel Chavez was required to participate in a sex offender treatment program. When he refused to admit to the conduct underlying his conviction, a required part of his treatment, Chavez was discharged from the program and given a limited jail sanction, as permitted under regulations applicable to supervised releasees. Chavez brought a civil action under 42 U.S.C. § 1983 seeking damages for violations of his constitutional rights due to this sequence of events, but the district court dismissed his complaint.

We conclude that because Chavez did not make a statement that was used in a criminal proceeding, *see Chavez v. Martinez*, 538 U.S. 760, 770 (2003) (plurality opinion), he may not bring a civil action against the government under § 1983 for a violation of his Fifth Amendment right against self-incrimination, and we affirm the district court's dismissal of this claim. We also affirm the dismissal of Chavez's claims that the government officials involved in this incident violated Chavez's Sixth Amendment right to counsel and his First Amendment right to bring a civil lawsuit against the government.

I

In May 2008, Daniel Chavez was indicted by an Oregon grand jury in connection with sexual misconduct involving minors under 14 years of age.[1] Chavez claimed he was innocent of the charged offenses, and went to trial. In March 2009, the jury convicted Chavez of two counts of felony attempted sexual abuse in the first degree and two counts of misdemeanor private indecency. The court sentenced him to 18 months incarceration on one of the attempted sexual abuse counts, followed by 60 months post-prison supervision.[2] As a condition of his supervised release, Chavez was required,

---

[1] On this appeal of a grant of a motion to dismiss, we rely on the facts set forth in the Second Amended Complaint (SAC), as well as attachments or documents incorporated by reference, *see Koala v. Khosla*, 931 F.3d 887, 894 (9th Cir. 2019), and matters subject to judicial notice, *see United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003).

[2] Chavez was also sentenced to 60 months probation on the other attempt count, and two 30-day jail sentences to be served concurrently with the 18-month sentence for the misdemeanor counts. The court required him to register as a sex offender as a condition of probation.

among other things, to complete a sex offender treatment program.**[3]**

Chavez appealed his conviction. On appeal, he was represented by a lawyer from the state office of public defense services. Chavez argued that the trial court erred by admitting a physician's medical diagnosis that a child had been sexually abused, where that diagnosis was not based on physical evidence of abuse, because such evidence was more prejudicial than probative. *See* Or. Evid. Code, Rule 403; *State v. Southard*, 218 P.3d 104, 133 (Or. 2009). Chavez also filed a supplemental brief pro se.

While his appeal was pending, Chavez finished his prison term and returned to Klamath County. Chavez's probation officer, Lisa Moore, was responsible for monitoring Chavez's compliance with probation and post-prison supervision. She directed Chavez to enroll in a sex offender treatment program provided by David Robinson and his company, Correctional Evaluation and Treatment, Inc. (CET).

Chavez appeared for the treatment program in June 2010. At the initial meeting, Robinson told him that as a condition of the program, Chavez had to admit to the conduct underlying each count of his conviction. Robinson also required Chavez to sign a form authorizing Robinson to disclose anything discussed in the program to Chavez's

---

**[3]** If a defendant is on post-prison supervision following conviction of a sex crime, Oregon law requires the following special condition of the person's post-prison supervision: "Entry into and completion of or successful discharge from a sex offender treatment program approved by the board, supervisory authority or supervising officer. The program may include polygraph and plethysmograph testing. The person is responsible for paying for the treatment program." Or. Rev. Stat. § 144.102(4)(b)(F).

probation officer. Chavez asked for an opportunity to speak to an attorney about how the admissions might affect his pending appeal. Robinson told him that if he failed to admit to the criminal conduct underlying his conviction, he would go to jail.[4]

When Chavez refused to admit to the conduct underlying his counts of conviction, Robinson dismissed him from the sex offender treatment program and notified Moore. Moore initiated post-prison supervision sanction proceedings against Chavez for failing to comply with the conditions of his supervised release. At the proceedings, Chavez was found to be in violation of the sex offender treatment requirement of his post-prison supervision, and was given a jail sanction. The record is unclear regarding the length of the jail sanction. Chavez did not appeal the revocation of supervised release.

In August 2010, a similar sequence of events unfolded. Pursuant to Chavez's court-ordered sentence, Moore directed Chavez to enroll in Robinson's sex offender treatment program. Chavez again refused to admit to the conduct underlying his conviction, and Robinson again dismissed

---

[4] Under Oregon law, the Department of Corrections (or another supervisory authority) may sanction a defendant who violates post-prison supervision conditions by imposing "a continuum of administrative sanctions." Or. Rev. Stat. § 144.106(1). If the available administrative sanctions are inadequate, the supervisory authority may request the State Board of Parole and Post-Prison Supervision to impose a sanction of incarceration. Or. Admin. R. 213-011-0004(2). Based on such a request, "the Board shall hold a hearing to determine whether incarceration in jail is appropriate and may impose an appropriate term of incarceration up to ninety (90) days for a technical violation and up to one hundred and eighty (180) days for conduct constituting a crime." Or. Admin. R. 213-011-0004(3).

Chavez from the program and notified Moore. Moore then initiated a second round of post-prison supervision sanction proceedings against Chavez. At the proceedings, Chavez was found to be in violation of the sex offender treatment condition of his post-prison supervision and a second jail sanction was imposed against him. Again, the record is unclear as to the length of the jail sanction imposed. And again, Chavez did not appeal this revocation.

Following the imposition of the second sanction, Chavez's appellate counsel moved the state trial court to stay the post-prison supervision condition that Chavez enroll in a sex offender treatment program. The counsel argued that the state could not implement the treatment provision unless it gave Chavez complete immunity for any statements he made during his treatment. The counsel acknowledged that the Oregon deputy district attorney had previously represented that Chavez *would* be given such immunity, but there was nothing in the record that "b[ound] the district attorney's office to that pledge." Therefore, counsel argued, the court should require the state to make that commitment on the record in open court.

A few weeks later, the court denied the motion to stay treatment, but issued an order granting Chavez immunity from any statements or admission made about his conduct in the course of sex offender treatment, as well as any evidence gained as a result of such statements or admission, except in any proceedings related to homicide. In March 2011, Chavez filed a pro se civil rights complaint in federal court under 42 U.S.C. § 1983, alleging that Moore and Robinson violated his constitutional right not to incriminate himself. Robinson subsequently dismissed Chavez from the sex offender treatment program. Based on this dismissal, Moore revoked

Chavez's supervised release and imposed a third jail sanction on Chavez for refusing to participate in or comply with the treatment program. Chavez did not appeal this revocation.

In February 2012, the Oregon Court of Appeals reversed Chavez's conviction and remanded for a new trial. *State v. Chavez*, 272 P.3d 167, 167 (Or. 2012). The state conceded that the trial court made an evidentiary error in admitting a physician's diagnosis that Chavez had sexually abused the alleged victims, and the court agreed. *Id.* On remand, Chavez and the state entered into a plea agreement pursuant to which Chavez pleaded "no contest" to one count of felony attempted sexual abuse, and the state dismissed the other counts and recommended a sentence of time served with a requirement that Chavez register as a sex offender. The court accepted the plea in February 2014 and imposed the sex offender registration requirement.

In 2013, the district court issued an order to show cause why Chavez's civil rights complaint should not be dismissed for failure to prosecute. Chavez filed a document titled "Tort Claim with Damages" that named Robinson and the Oregon Board of Parole as defendants. The district court construed this document as an amended complaint and sua sponte dismissed the complaint with prejudice on the ground that the defendants were immune from damages. *See* 28 U.S.C. § 1915(e)(2)(B)(iii). It held that members of the Oregon Board of Parole were entitled to absolute immunity under the Eleventh Amendment. It also held that Robinson was entitled to qualified immunity because "[a] reasonable therapist in Robinson's place would not believe he was violating a convicted sex offender's civil rights by evaluating the offender in accordance with the legally mandated conditions

of probation," and, to the extent Moore was still a defendant in the case, she was also entitled to qualified immunity.

Chavez appealed, and we reversed, holding that the district court erred in dismissing the complaint on qualified-immunity grounds given the procedural posture of the case at that time. *Chavez v. Robinson*, 817 F.3d 1162, 1165 (9th Cir. 2016). On remand, Chavez (now represented by pro bono counsel) filed a first amended complaint, alleging that Moore and Robinson violated his rights under the Fifth Amendment and the Fourteenth Amendment Due Process Clause. Both defendants moved to dismiss the claims against them. Moore contended, among other things, that she was entitled to absolute immunity as a parole officer, and Robinson argued he was not acting under color of state law, or, alternatively, that he was entitled to qualified immunity. The district court granted the motions to dismiss but allowed leave to amend.

Chavez filed a second amended complaint (the operative pleading here) in May 2018 (the SAC). The SAC alleged three different claims under § 1983: (1) a violation of Chavez's Fifth and Fourteenth Amendment rights by requiring him to admit to the conduct underlying his convictions, (2) a violation of his Sixth Amendment right to counsel by retaliating against him for asserting his right to speak with a lawyer, and (3) a violation of his First Amendment right to free speech by dismissing him from treatment after he filed the pending lawsuit. The court again dismissed the complaint, this time with prejudice. After assuming without deciding that Robinson was a state actor, the court held that Chavez failed to state a claim with respect to all three claims, and that, in any event, the defendants were entitled to qualified immunity on all three claims. This appeal followed.

We have jurisdiction under 28 U.S.C. § 1291, and we review de novo a district court's dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Curtis v. Irwin Indus., Inc.*, 913 F.3d 1146, 1151 (9th Cir. 2019). "To survive a motion to dismiss, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). We accept as true "well-pleaded factual allegations," but not "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.*

## II

We first address Chavez's claim that Robinson and Moore violated his Fifth Amendment right against self-incrimination. Chavez's claim requires us to consider the distinction between the "core constitutional right protected by the Self-Incrimination Clause" and the "prophylactic rules designed to safeguard" that right. *Chavez*, 538 U.S. at 770.

### A

#### 1

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990). It "permits a person to refuse to testify against himself at a criminal trial in which he is a defendant." *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984). "Although conduct by law enforcement

officials prior to trial may ultimately impair that right, a constitutional violation occurs only at trial." *Verdugo-Urquidez*, 494 U.S. at 264.

While the text of the Self-Incrimination Clause establishes a trial right, *see id.*, the Supreme Court has interpreted the clause as barring the government from engaging in certain pretrial conduct, such as compelling a person to make incriminating statements (absent a grant of immunity) or punishing a person who refuses to make such statements, *see Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977) ("[The] government cannot penalize assertion of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony which has not been immunized."). A person subjected to questioning by the government may "refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant." *Lefkowitz v. Turley*, 414 U.S. 70, 78 (1973). This rule "applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it" in future criminal proceedings. *Id.* at 77 (quoting *McCarthy v. Arndstein*, 266 U.S. 34, 40 (1924)). The Court has applied this rule to protect police officers from the choice "between self-incrimination or job forfeiture," *Garrity v. New Jersey*, 385 U.S. 493, 496 (1967), to protect public employees from similar sanctions, *see Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation of City of N.Y.*, 392 U.S. 280, 283–84 (1968), and to protect independent contractors from losing their opportunity to secure public contracts, *Turley*, 414 U.S. at 82. In the probation context, the Court has held that the government cannot "constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth

Amendment privilege," as when a probationer refuses "to answer questions calling for information that would incriminate in separate criminal proceedings." *Murphy*, 465 U.S. at 438.[5]

The Court has taken different approaches to shield individuals from such government compulsion. Where witnesses refused to testify despite the government's threat that sanctions would be imposed, "the Court ruled that the state could not constitutionally make good on its prior threat." *Id.* at 434. Where "an individual succumbed to the pressure placed upon him, failed to assert the privilege, and disclosed incriminating information which the state later sought to use against him in a criminal prosecution," *id.*, the Court held the privilege was not waived, *id.*, and such testimony was subject to an exclusionary rule which "prohibits use in subsequent criminal proceedings of statements obtained" under a compulsion, *Garrity*, 385 U.S. at 500; *see also Turley*, 414 U.S. at 78 (holding that if a witness is compelled to answer incriminating questions without immunity, "his

---

[5] The dissent relies heavily on these Supreme Court decisions holding that the government may not punish a person who refuses to make non-immunized incriminating statements. Dissent at 50–53 (citing *Murphy*, 465 U.S. at 434; *Malloy v. Hogan*, 378 U.S. 1, 8 (1964); *Cunningham*, 431 U.S. at 806; *Uniformed Sanitation Men*, 392 U.S. at 283; *Turley*, 414 U.S. at 82). But the scope of the shield provided by the Self-Incrimination Clause is neither in doubt nor at issue in this case, because the Supreme Court subsequently made clear that a person cannot use this shield as a sword to claim damages for a violation of this prophylactic rule. *See* Section II.A.2, *infra*.

answers are inadmissible against him in a later criminal prosecution").**[6]**

The shield provided by this judicial doctrine has limitations. First, the Court has made clear that it is not implicated if statements are made voluntarily, as when a person "is anxious to make a clean breast of the whole affair," *see Garrity*, 385 U.S. at 499. Nor does it apply when a person does not invoke the privilege against self-incrimination and any pressure to make incriminating statements does not rise to the level of compulsion, *see Murphy*, 465 U.S. at 427 (holding that a probationer's "general obligation to appear and answer [the probation officer's] questions truthfully did not in itself convert [the probationer's] otherwise voluntary statements into compelled ones"). Second, the shield of the judge-made rule is not applicable if the statements do not pose a reasonable risk of being incriminating. *Id.* Nor is the shield applicable if the state has provided an appropriate scope of immunity to the

---

**[6]** The Court has treated the bar against compelling a person to sign a document waiving immunity as distinct from the bar against compelling testimony because "[o]nce an immunity waiver is signed, the signatory is unable to assert a Fifth Amendment objection to the subsequent use of his statements in a criminal case, even if his statements were in fact compelled." *Chavez*, 538 U.S. at 768 n.2. Thus when employees have been discharged "not for failure to answer relevant questions about [their] official duties, but for refusal to waive a constitutional right" by signing a waiver document, *Gardner v. Broderick*, 392 U.S. 273, 279 (1968), the Court has held that "the State may not insist that appellees waive their Fifth Amendment privilege against self-incrimination and consent to the use of the fruits of the interrogation in any later proceedings brought against them," *Turley*, 414 U.S. at 84–85; *see also Gardner*, 392 U.S. at 279 (invalidating the discharge of a police officer for "refusal to execute a document purporting to waive his constitutional rights and to permit prosecution of himself on the basis of his compelled testimony").

witness. *Kastigar v. United States*, 406 U.S. 441, 453 (1972). Rather, if a person's testimony is immunized "from use and derivative use" in a future criminal proceeding, such immunity "is sufficient to compel testimony over a claim of the privilege." *Id.* A state may constitutionally punish individuals who refuse to provide testimony once immunized. *See Turley*, 414 U.S. at 84 (holding that "if immunity is supplied and testimony is still refused," the courts may compel testimony "by use of civil contempt and coerced imprisonment," and the government may deprive them of employment or impose other punishments).

The limitations on the protection provided by the Self-Incrimination Clause with respect to the government's pre-trial conduct are equally applicable to the protections provided by the clause at trial. To invoke the Fifth Amendment's trial right, a person must be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. If there is no compulsion, because the statement is voluntary, or because the incriminating testimony cannot be used against the witness due to the grant of immunity, then the Self-Incrimination Clause is not implicated.

2

In *Chavez v. Martinez*, the Supreme Court considered the distinction between the trial right set forth in the text of the Fifth Amendment, and the broader judge-made rule shielding individuals from government compulsion to make incriminating statements. 538 U.S. at 770. *Chavez* involved a plaintiff engaged in a shootout with the police, which resulted in his suffering severe injuries that ultimately left him "permanently blinded and paralyzed from the waist down." *Id.* at 764. The police accompanied plaintiff to the

hospital, where they questioned him while he was receiving medical treatment. *Id.* According to the district court, the plaintiff "had been shot in the face, both eyes were injured; he was screaming in pain, and coming in and out of consciousness while being repeatedly questioned about details of the encounter with the police." *Id.* at 798 (Kennedy, J., concurring in part). The plaintiff was not given *Miranda* warnings or otherwise told that his cooperation should be voluntary. *Id.* While undergoing this questioning, the plaintiff made damaging admissions. *Id.* at 764 (plurality opinion). In the end, the government did not charge plaintiff with a crime or use the plaintiff's answers against him in any criminal prosecution. *Id.* Nevertheless, the plaintiff brought a § 1983 action against the police officer on the ground that the coercive questioning itself violated his Fifth Amendment rights, "as well as his Fourteenth Amendment substantive due process right to be free from coercive questioning." *Id.* at 765. A Ninth Circuit panel agreed that the plaintiff had stated a claim that the coercive questioning violated both his Fifth and Fourteenth Amendment rights. *Id.* at 765–66.

A majority of the Supreme Court reversed. *Id.* at 776. The case generated six separate opinions. Two opinions reversed our ruling on the Fifth Amendment claim: an opinion authored by Justice Thomas and joined by Chief Justice Rehnquist, Justice O'Connor, and Justice Scalia as to the Fifth Amendment analysis, *id.* at 763–76, and an opinion authored by Justice Souter and joined by Justice Breyer, *id.* at 779 (Souter, J., concurring).[7]

---

[7] A different majority held that the plaintiff might be able to establish the elements of a substantive due process claim for outrageous government conduct, and remanded this claim for further consideration.

Justice Thomas's plurality opinion concluded that the officer's alleged conduct did not violate the plaintiff's core constitutional Fifth Amendment rights, and therefore the officer was entitled to qualified immunity. *Id.* at 766 (plurality opinion). According to the plurality, based on the text of the Fifth Amendment, a person's rights under the Self-Incrimination Clause are not violated unless that person is prosecuted for a crime and actually compelled to be a witness against himself in a criminal case. *Id.* at 766–67. "The text of the Self-Incrimination Clause simply cannot support the Ninth Circuit's view that the mere use of compulsive questioning, without more, violates the Constitution." *Id.* at 767. The plurality recognized that the Court had also created "prophylactic rules designed to safeguard the core constitutional right protected by the Self-Incrimination Clause." *Id.* at 770. Such procedural safeguards are "not themselves rights protected by the Constitution but . . . measures to insure that the right against compulsory self-incrimination was protected." *Id.* (quoting *Michigan v. Tucker*, 417 U.S. 433, 444 (1974)). Therefore, a person cannot seek damages under § 1983 for a violation of the "evidentiary privilege that protects witnesses from being forced to give incriminating testimony." *Id.* at 770–71. Justice Thomas, joined by Chief Justice Rehnquist and Justice Scalia, also concluded that the questioning did not violate the plaintiff's due process rights. *Id.* at 776.

Justice Souter, in an opinion joined by Justice Breyer, agreed that the plaintiff's claims should be rejected. Souter recognized that the rule the plaintiff sought, "asking this Court to hold that the questioning alone was a completed violation of the Fifth and Fourteenth Amendments subject to redress by an action for damages under § 1983," was "well outside the core of Fifth Amendment protection," because the

Self-Incrimination Clause "focuses on courtroom use of a criminal defendant's compelled, self-incriminating testimony, and the core of the guarantee against compelled self-incrimination is the exclusion of any such evidence." *Id.* at 777 (Souter, J., concurring). But, according to Justice Souter, "that alone [was] not a sufficient reason to reject" the plaintiff's § 1983 claim. *Id.* Justice Souter relied on an additional reason: the plaintiff could not "make the powerful showing, subject to a realistic assessment of costs and risks, necessary to expand protection of the privilege against compelled self-incrimination to the point of the civil liability," which the plaintiff asked the Court to recognize. *Id.* at 778 (cleaned up). Justice Souter worried that if the evidentiary privilege could be used as a sword, damages would be available "in every instance of interrogation producing a statement inadmissible under Fifth and Fourteenth Amendment principles, or violating one of the complementary rules [the Court has] accepted in aid of the privilege against evidentiary use." *Id.* Broadly expanding the availability of damage actions in this manner was not "necessary in aid of the basic guarantee," and instead a plaintiff could raise a substantive due process claim for outrageous government conduct. *Id.* at 779. Therefore, Justice Souter rejected the Fifth Amendment claim. Nevertheless, he disagreed with Justice Thomas on the substantive due process claim, and would remand that claim to the district court. *Id.* at 779–80. Four other justices agreed that the substantive due process claim for outrageous government conduct should be remanded, making the subsection of Justice Souter's opinion discussing this issue the opinion of the Court. *See id.* at 777 n.*; *see also id.* at 799 (Kennedy, J., concurring in part).

Although none of the six separate opinions in *Chavez* "provides a binding rationale" in itself, *Tekoh v. County of Los Angeles*, 985 F.3d 713, 722 (9th Cir. 2021), based on the opinions of the five justices who rejected the plaintiff's Fifth Amendment claim, we have concluded that *Chavez* stands for the proposition that "mere coercion does not violate the text of the Self-Incrimination Clause absent use of the compelled statements in a criminal case against the witness," *Aguilera v. Baca*, 510 F.3d 1161, 1173 (9th Cir. 2007) (quoting *Chavez*, 538 U.S. at 769). Rather, "[o]nly after a compelled incriminating statement is used in a criminal proceeding has an accused suffered the requisite constitutional injury for purposes of a § 1983 action." *Id.*; *see also Stoot v. City of Everett*, 582 F.3d 910, 923 (9th Cir. 2009) (holding that in *Chavez* "the Court held that coercive police questioning does not violate the Fifth Amendment, absent use of the statements in a criminal case" and that "the Fifth Amendment was not violated unless and until allegedly coerced statements were used against the suspect in a criminal case"). In short, "the Fifth Amendment provides a right against compelled self-incrimination, but that right only applies when a compelled statement is used against a defendant in a 'criminal case.'" *United States v. Hulen*, 879 F.3d 1015, 1018 (9th Cir. 2018) (quoting *Chavez*, 538 U.S. at 766–67).

Accordingly, we have recognized the distinction between the core Fifth Amendment trial right, which a plaintiff can use as a sword against a government official in a § 1983 action, and the judicially created prophylactic rule, which shields a person from coercive government questioning, but does not provide the basis for a § 1983 action. *See, e.g.*, *id.* at 1020; *Stoot*, 582 F.3d at 923; *Aguilera*, 510 F.3d at 1173–74. We first recognized this distinction in *United States v. Antelope*, where a convicted sex offender on

supervised release was required to disclose his "full sexual history" (including past criminal offenses other than those for which he was convicted) on pain of revocation of probation and supervised release. 395 F.3d 1128, 1131 (9th Cir. 2005). The district court revoked the sex offender's probation for failing to comply with this requirement, *id.*, and then denied the sex offender's request for immunity, even though his incriminating statements could be used for prosecutorial purposes, *id.* at 1139. We held that "[b]ecause the government and district court have consistently refused to recognize that the required answers may not be used in a criminal proceeding" against the sex offender, "the revocation of his probation and supervised release violated his Fifth Amendment right against self-incrimination." *Id.* (cleaned up) (quoting *Murphy*, 465 U.S. at 435 n.7). Therefore, we reversed the revocation of the sex offender's supervised release. *Id.* at 1142. In doing so, we rejected the government's characterization of *Chavez* as holding that the defendant could not "assert the Fifth Amendment right until the moment a compelled statement is used in a criminal proceeding against him." *Id.* at 1140. We explained that "[c]ritical to the reasoning of all six justices [in *Chavez*] was the simple principle that the scope of the Fifth Amendment's efficacy is narrower when used as a sword in a civil suit than when used as a shield against criminal prosecution." *Id.* at 1141. Therefore, a defendant can successfully invoke prophylactic rules that safeguard the Fifth Amendment right against self-incrimination, even though the defendant could not "turn the tables" and impose civil liability under § 1983 for a violation of those rules. *Id.*

Subsequently, we directly addressed the circumstances under which a plaintiff could bring a civil action for violation of his rights under the Self-Incrimination Clause. *See*

*Aguilera*, 510 F.3d at 1173–74. *Aguilera* dismissed a § 1983 action alleging a Fifth Amendment violation brought by deputies subjected to questioning during an internal investigation because "the deputies were never charged with a crime, and no incriminating use of their statements has ever been made." *Id.* at 1173. Noting that six justices in *Chavez* agreed with the proposition that use of a compelled statement in a criminal proceeding is a prerequisite to a § 1983 action based on the Self-Incrimination Clause, we held, "[p]lainly, *Chavez* applies in situations where a party actually makes an incriminating statement and the government then decides to use it in a criminal proceeding. If it does so, the Fifth Amendment is violated. Otherwise, it is not." *Id.* at 1174 n.9. If an incriminating statement is not used in a criminal proceeding, "there is no cognizable Fifth Amendment claim." *Id.*

Cases after *Aguilera* clarified what constitutes use of a compelled statement in a criminal proceeding, but reaffirmed that a plaintiff cannot bring a § 1983 claim absent such use. *Stoot*, 582 F.3d at 923 (characterizing the plurality and concurring opinions in *Chavez* as agreeing that use of a compelled statement in a criminal case is required to bring a § 1983 claim based on the Fifth Amendment); *Crowe v. County of San Diego*, 608 F.3d 406, 427 (9th Cir. 2010) (noting that "[i]n *Chavez*, the Supreme Court held that mere coercion does not create a cause of action under § 1983 for a violation of the Self-Incrimination Clause, absent use of the compelled statement in a criminal case," and holding that use of a compelled statement in certain pre-trial proceedings violated the Fifth Amendment); *Hulen*, 879 F.3d at 1018 (reiterating that an individual may bring a § 1983 claim based on the Self-Incrimination Clause only "when a compelled statement is used against a defendant in a 'criminal case,'"

and holding that use of a compelled statement in a parole revocation hearing did not qualify as "use[] in a criminal case"); *cf. Tekoh*, 985 F.3d at 721 ("The specific holding in *Chavez* does not govern Tekoh's case because unlike the plaintiff in *Chavez*, Tekoh's un-Mirandized statements were used against him in criminal proceedings."); *Tobias v. Arteaga*, 996 F.3d 571, 583 (9th Cir. 2021) (holding that a plaintiff could bring a § 1983 action for a coercive interrogation where the government had used the resulting confession in a criminal case against the plaintiff).

Our sister circuits have likewise uniformly interpreted *Chavez* as standing for the proposition that use of a compelled statement in a criminal proceeding is a prerequisite to a § 1983 suit based on a violation of the Self-Incrimination Clause. *See, e.g.*, *Koch v. City of Del City*, 660 F.3d 1228, 1245 n.9 (10th Cir. 2011) ("Although Justices Souter and Breyer did not join the plurality [in *Chavez*], they agreed that the Fifth Amendment 'focuses on courtroom use of a criminal defendant's compelled, self-incriminating testimony.'"); *Renda v. King*, 347 F.3d 550, 558 (3d Cir. 2003) ("[S]ix Justices [in *Chavez*] . . . agreed that mere custodial interrogation absent *Miranda* warnings is not a basis for a § 1983 claim."); *Allison v. Snyder*, 332 F.3d 1076, 1080 (7th Cir. 2003) ("A majority of the Justices concluded in *Chavez* . . . that courts may not award damages [where] . . . incriminating information . . . is never used in a criminal prosecution."); *see also United States v. Riley*, 920 F.3d 200, 205 (4th Cir. 2019); *United States v. Allen*, 864 F.3d 63, 82 (2d Cir. 2017); *Knight ex rel. Kerr v. Miami-Dade County*, 856 F.3d 795, 823 (11th Cir. 2017); *Winslow v. Smith*, 696 F.3d 716, 731 n.4 (8th Cir. 2012); *Murray v. Earle*, 405 F.3d 278, 285 n.11 (5th Cir. 2005). This rule is applicable whether the plaintiff refused to speak in the face of

coercive questioning or succumbed to the coercion and made incriminating statements. *See, e.g.*, *Entzi v. Redmann*, 485 F.3d 998, 1002 (8th Cir. 2007) (rejecting a § 1983 claim based on the Self-Incrimination Clause where the plaintiff had been sanctioned for declining to make any statement); *Koch*, 660 F.3d at 1245 (same); *Burrell v. Virginia*, 395 F.3d 508, 513 (4th Cir. 2005) (same).

The dissent argues that because *Tekoh* held that none of the six opinions in *Chavez* provided a binding rationale, 985 F.3d at 722, *Chavez* and our opinions interpreting *Chavez* have no precedential effect beyond their facts and specific result. Dissent at 58. This argument is meritless. In *Chavez*, six justices agreed that there can be no § 1983 claim unless a plaintiff's incriminating statement is introduced in his criminal proceeding. Given this shared conclusion, it makes no difference that Justice Thomas reached this conclusion relying on the text of the Self-Incrimination Clause itself, *Chavez*, 538 U.S. at 767, while Justice Souter held merely that there was not a sufficient basis "to expand protection of the privilege against compelled self-incrimination to the point of the civil liability" for violations of "one of the complementary rules [the Court has] accepted in aid of the privilege," *id.* at 777–78 (Souter, J., concurring). We confirmed the rule established by *Chavez* in subsequent opinions holding that the Self-Incrimination Clause is not violated until a statement is introduced in a criminal proceeding. *See, e.g.*, *Antelope*, 395 F.3d at 1141; *see also Aguilera*, 510 F.3d at 1174 n.9. *Tekoh* does not purport to overrule our binding precedent, and of course a three-judge panel could not do so. *See Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc) ("[A] published decision of this court constitutes binding authority which 'must be followed unless and until overruled by a body

competent to do so.'" (quoting *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001))), *aff'd sub nom. Arizona v. Inter Tribal Council of Ariz., Inc*., 570 U.S. 1 (2013).  Therefore, we are bound by the rule adopted by six justices in *Chavez*, as enunciated in our precedent, which is also consistent with the rule adopted by our sister circuits.

B

We now turn to the question whether Chavez can assert a § 1983 claim for a Fifth Amendment violation on the ground that the defendants sanctioned him for asserting his right to remain silent, without expressly granting him immunity from use of his statement in a subsequent criminal proceeding.  In light of the principles discussed above, Chavez may not do so.  To bring a § 1983 action based on a Fifth Amendment violation, the government must violate a plaintiff's "core constitutional right," *Antelope*, 395 F.3d at 1141, which is the "use of the compelled statements in a criminal case against the witness," *Aguilera*, 510 F.3d at 1173 (quoting *Chavez*, 538 U.S. at 769).  Here, Chavez did not make an incriminating statement, nor was any such statement used in a criminal proceeding.  Rather, his claim is based on a violation of the judge-made protection from being forced to give incriminating testimony.  Because this privilege is a "prophylactic rule[] designed to safeguard the core constitutional right protected by the Self-Incrimination Clause" rather than the "core constitutional right" itself, *Chavez*, 538 U.S. at 770, Chavez may use the privilege only defensively as a shield, and may not wield it as a sword in an action for damages, *see Antelope*, 395 F.3d at 1141; *Aguilera*, 510 F.3d at 1173.  Thus, we affirm the dismissal of Chavez's Fifth Amendment claim.

Chavez urges us to rely on the Sixth Circuit's conclusion that "*Chavez* only applies where a party actually makes self-incriminating statements," and does not apply to a person like himself, who refused to make self-incriminating statements. *Moody v. Mich. Gaming Control Bd.*, 790 F.3d 669, 675 (6th Cir. 2015) (quoting *Aguilera*, 510 F.3d at 1179 (Kozinski, J., dissenting "for the most part")). The dissent likewise relies on this distinction, arguing that the *Chavez* rule expressed in our precedent does not apply "where the privilege *is* invoked, no statement is given, and the individual suffers punishment as a consequence," Dissent at 48, and attempts to distinguish our precedent as not including all three factual circumstances.

This argument fails because Chavez's and the dissent's proposed rule is directly contrary to our precedent. *Aguilera* explained that an accused suffers "the requisite constitutional injury for purposes of a § 1983 action" only "after a compelled incriminating statement is used in a criminal proceeding." 510 F.3d at 1173. Therefore, it makes no difference if the government punished a person for refusing to make incriminating statements, *Cunningham*, 431 U.S. at 807, or if the government coerced incriminating statements by threat of punishment, *Garrity*, 385 U.S. at 499–500. Neither violation provides a basis for a § 1983 action. *See* Section II.A.2, *supra*; *cf. Tekoh*, 985 F.3d at 721 (allowing a plaintiff's § 1983 claim to proceed when the statement was used in his criminal case); *Tobias*, 996 F.3d at 583 (same). Therefore, the dissent's argument that a violation at trial is not required when a person remains silent in the face of coercive government questioning, Dissent at 48, is meritless. Other circuits have agreed with our approach. *See, e.g.*, *Entzi*, 485 F.3d at 1004 (rejecting a § 1983 claim based on the Self-Incrimination Clause where the plaintiff had been

sanctioned for declining to make any statement); *Koch*, 660 F.3d at 1245 (same); *Burrell*, 395 F.3d at 513 (same). *Moody* gives no support to Chavez because, as its reliance on the dissent in *Aguilera* suggests, *Moody* is contrary to our precedent.

Contrary to the dissent, Dissent at 48, there is no exception to the *Chavez* rule when a plaintiff invokes the privilege against self-incrimination, remains silent, and suffers punishment. In *Entzi*, for instance, a prisoner refused to undergo sex offender treatment that required him to admit guilt to the offense of conviction. 485 F.3d at 1000. As a result, the prisoner lost performance-based sentence-reduction credits, which "extended his term of imprisonment by more than a year." *Id.* at 1003. The prisoner brought a damages action under § 1983, on the ground that the loss of credits punished his assertion of the privilege against self-incrimination. *Id.* at 1003. The Eighth Circuit rejected this claim, holding, among other things, that "even assuming the denial of sentence-reduction credits were deemed to be 'compulsion' for purposes of the Fifth Amendment," no damages remedy under § 1983 was available, because "[n]o statements compelled from [the prisoner] have been introduced in evidence in a criminal case." *Id.* at 1004.

Lacking any support in precedent for his proposed rule, Chavez raises a policy argument. According to Chavez, if he cannot bring a § 1983 action, he will be deprived of any remedy for the jail sanction that the government wrongly imposed upon him for refusing to make incriminating statements. The dissent likewise argues that the shield against the government's efforts to compel admissions is meaningless if the government cannot be held liable for a violation under § 1983. *See* Dissent at 48. These arguments

miss the point of *Chavez*'s distinction between core constitutional rights and prophylactic rules. Even if the defendants erred in requiring Chavez to admit to the criminal conduct underlying his convictions on pain of a jail sanction, *Chavez* makes clear that such an error in implementing a prophylactic rule does not violate Chavez's constitutional rights, and therefore does not give rise to a constitutional tort under § 1983. The prophylactic rules are in place to safeguard Chavez's core constitutional right, which in this case was not violated. *See Chavez*, 538 U.S. at 772.

Moreover, contrary to Chavez and the dissent, Chavez could have sought protection from government sanctions in other ways. First, Chavez could have demanded immunity before making a statement in the sex offender therapy, *see Kastigar*, 406 U.S. at 453, and in fact, Chavez obtained such immunity after he raised the issue. Alternatively, like the prisoner in *Antelope*, Chavez could have appealed the revocation of supervised release and obtained a reversal of the revocation and an order preventing the government from compelling incriminating statements absent immunity. *See* 395 F.3d at 1141.[8]

---

[8] The dissent argues that Chavez could not seek such relief because, according to Chavez's original pro se complaint, "[t]he moment he refused to incriminate himself, he 'was immediately apprehended, handcu61ffed and taken to jail' where 'he was detained without bail.'" Dissent at 61 n.3. Chavez chose not to make this dramatic assertion in his Second Amended Complaint, which renders his original complaint "non-existent." *Ramirez v. County of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015). The amended complaint states only that Moore (not Robinson) revoked Chavez's supervised release, which ultimately led to the imposition of an incarceration sanction. On appeal, Chavez asserts that "Defendants [Robinson and Moore] immediately terminated him from the program and jailed him," but later explains that Robinson dismissed Chavez from the program and notified Moore "who jailed Mr. Chavez for violating the

Finally, if Chavez had asserted his Fifth Amendment rights and then made the admissions required by his sex offender treatment program, the exclusionary rule would have allowed Chavez to suppress the confession if a re-trial were to occur. *See Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 76 (1964), *abrogated on other grounds*, *United States v. Balsys*, 524 U.S. 666, 687–88 (1998). In other words, the prophylactic rules are available as a safeguard to prevent "conduct by [government] officials prior to trial" that could impair a person's core Fifth Amendment rights, *Verdugo-Urquidez*, 494 U.S. at 264; they do not provide a sword to sanction the government for an error in implementing one of these procedural safeguards. As Justice Souter warned, if a § 1983 action could be raised to enforce every "complementary rule" the Supreme Court has "accepted in aid of the privilege against evidentiary use," there would be "no limiting principle or reason to foresee a stopping place short of liability in all such cases." *Chavez*, 538 U.S. at 779 (Souter, J., concurring).

Finally, the dissent relies on *McKune v. Lile*, 536 U.S. 24 (2002) (plurality opinion), to support its argument that Chavez has a § 1983 cause of action here. Dissent at 60. This reliance is misplaced because *McKune*, another plurality opinion, did not even address the issue before us. In *McKune*, prison officials recommended that a convicted sex offender "enter a prison treatment program so that he would not rape again upon release." 536 U.S. at 29. The program required each participant "to admit having committed the crime for which he is being treated and other past offenses." *Id.* The

---

treatment requirement." In any event, Chavez was not precluded from appealing a government sanction, given that he was represented by counsel at this time.

program did not offer immunity because of the therapeutic benefit for the participants "to accept full responsibility for their past actions." *Id.* at 34. The prisoner in *McKune* refused to participate in the program on the ground that the required admissions would violate his Fifth Amendment privilege. *Id.* at 31. Instead, he brought an action under § 1983 seeking an injunction to prevent the prison from "withdrawing his prison privileges and transferring him to a different housing unit" as a result of his failure to enter into the program. *Id.*

The Supreme Court rejected his claim. Justice Kennedy's plurality opinion concluded that the prisoner had not suffered a violation of his Fifth Amendment right because "[t]he consequences in question . . . are not ones that compel a prisoner to speak about his past crimes despite a desire to remain silent." *Id.* at 36. Justice O'Connor's opinion, which we treat as controlling, *see Antelope*, 395 F.3d at 1133 n.1, agreed that the consequences were not "so great as to constitute compulsion for purposes of the Fifth Amendment privilege against self-incrimination," 536 U.S. at 49 (O'Connor, J., concurring), but cautioned that she was not establishing "a comprehensive theory of the Fifth Amendment privilege against self-incrimination," *id.* at 53. In other words, the Supreme Court resolved the prisoner's appeal on the ground that the absence of compulsion eliminates the possibility of a Fifth Amendment claim.

Having rejected the prisoner's § 1983 claim on the ground that his testimony was not compelled, the Court did not consider any other ground for rejecting the claim. No opinion in *McKune* addressed whether the prisoner could have raised a § 1983 claim even though his admissions were not used in a criminal case against him. There is no basis, therefore, for

the dissent's assertion that "all nine justices in *McKune* indicated" that § 1983 liability would attach to a claim like Chavez's. Dissent at 60. Put differently, *McKune* provides no support whatsoever for the dissent's proposed rule that a prisoner who suffers punishment as a consequence of failing to speak can bring an action under § 1983. Dissent at 60. Rather than conjure a rule from *McKune*'s silence, it is more fruitful to consider how the Court addressed that exact issue in the very next term, and held that a plaintiff has not suffered a violation of the core constitutional right—and cannot bring a § 1983 action—if no compelled statement is used in a criminal case. *Chavez*, 538 U.S. at 772.

In sum, we are bound by our precedent, which makes clear that the Fifth Amendment is not violated "unless and until allegedly coerced statements were used against the suspect in a criminal case." *Stoot*, 582 F.3d at 923. Because "the core of the guarantee against compelled self-incrimination is the exclusion" of compelled, incriminating evidence at trial, *Chavez*, 538 U.S. at 777 (Souter, J., concurring), and there is a completed violation of such a right only if the testimony is used at trial, we conclude that the district court did not err in dismissing Chavez's Fifth Amendment § 1983 action.

## C

Because we conclude that Chavez cannot bring a § 1983 claim for violation of his Fifth Amendment rights, we address the defendants' claim that they are entitled to qualified immunity only briefly.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing

(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). In determining whether an officer can be said to have violated a clearly established right, we must not "define clearly established law at a high level of generality," *al-Kidd*, 563 U.S. at 742, but instead "the clearly established law must be 'particularized' to the facts of the case," *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The Court does "not require a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (cleaned up)(quoting *al-Kidd*, 563 U.S. at 741). Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

When determining claims of qualified immunity at the motion-to-dismiss stage, we take the well-pleaded facts in the complaint as true. *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018). Here, the SAC alleges that the court ordered Chavez to complete a sex offender treatment program and that Robinson (the director of the program) required Chavez to "admit to the conduct alleged in each count of conviction"

as a condition of participating in the program.[9]  It is well established that sex offender treatment programs typically require "the program participant to admit having committed the crime for which he is being treated and other past offenses," and experts deem this to be an essential component of the program.  *McKune*, 536 U.S. at 30; *see also Antelope*, 395 F.3d at 1137 (noting that "requiring convicted sex offenders to give a sexual history, admitting responsibility for past misconduct to participating counselors, serves an important rehabilitative purpose," and that "[r]esearch indicates that offenders who deny all allegations of sexual abuse are three times more likely to fail in treatment than those who admit even partial complicity" (quoting *McKune*, 536 U.S. at 33)).[10]   The SAC does not provide any information regarding whether Chavez's statements would, or could, be used in a subsequent criminal proceeding.

Considering the "particularized" facts of this case, *see White*, 137 S. Ct. at 552, we must consider whether it was beyond debate that the director of a sex offender therapy program and a parole officer, acting under a valid court order requiring a releasee to participate in a sex offender program,

---

[9] Because the SAC alleges that Robinson acted under color of state law, we will assume it to be true for purposes of this analysis.  *Cf. Johnson v. Knowles*, 113 F.3d 1114, 1119 (9th Cir. 1997) (holding that a non-governmental employee may be sued as a state actor under § 1983 only if he is a "willful participant[] in joint activity with the State or its agents").

[10] Oregon law also requires that releasees admit past sexual conduct in certain circumstances.  Persons convicted of sex crimes are required to complete a sex offender treatment program if given a term of post-prison supervision.  Or. Rev. Stat. § 144.102(4)(b)(F).  Such programs may include polygraph testing, *id.*, which may be used to examine the releasee's sexual history, *see, e.g.*, *State v. Tenbusch*, 886 P.2d 1077, 1078 & n.1 (Or. 1994).

could not impose a sanction on the releasee for failure to participate in the program as required by court order. We are doubtful that a reasonable director of a sex offender therapy program and a parole officer are "plainly incompetent" or "knowingly violate the law," *Malley*, 475 U.S. at 341, if they sanction a releasee in this narrow context. Robinson and Moore could have reasonably concluded that Chavez's statements would not, or could not, be used in a subsequent criminal proceeding given the deputy district attorney's representation that Chavez would be given immunity and the fact that the state court subsequently issued an order ensuring that Chavez's statements could not be used in that manner. Robinson and Moore's situation thus differs from the one in *Antelope*, where the risk of incrimination was "real and appreciable" because, in part, the sex offenders' admissions of past sex crimes would "likely make their way into the hands of prosecutors," 395 F.3d at 1135, and lead "to more prosecutions and convictions," *id.* at 1138; *see also id.* (suggesting that a treatment program violates a sex offender's evidentiary privilege when it is "an elaborate attempt to avoid the protections offered by the privilege against compelled self-incrimination" (quoting *McKune*, 536 U.S. at 40–41)).

Further, Robinson and Moore could have reasonably concluded that they were bound to implement a valid court order. Indeed, government officials may be immune from liability where they act in reliance on a valid court order. *See Engebretson v. Mahoney*, 724 F.3d 1034, 1039 (9th Cir. 2013) (holding that prison officials charged with executing facially valid court orders enjoy absolute immunity from § 1983 liability for conduct prescribed by those orders). And we generally afford immunity to "parole officials for the 'imposition of parole conditions' and the 'execution of parole revocation procedures,' tasks integrally related to an official's

decision to grant or revoke parole." *Swift v. California*, 384 F.3d 1184, 1189 (9th Cir. 2004) (quoting *Anderson v. Boyd*, 714 F.2d 906, 909 (9th Cir. 1983)).  This immunity applies even where parole officers "impos[e] allegedly unconstitutional parole conditions." *Thornton v. Brown*, 757 F.3d 834, 839–40 (9th Cir. 2013).

But this qualified immunity analysis raises some close questions.  Robinson and Moore did not offer Chavez immunity (assuming they had the authority to do so) when they required Chavez to admit to the conduct underlying his conviction. Under *Antelope*, state officials may not impose sanctions on a sex offender for failure to make incriminating statements as part of a treatment program, where the officials expressly decline to offer immunity and insist that a sex offender's statements can be used in subsequent criminal proceedings.  395 F.3d at 1139. Rather than decide whether *Antelope* clearly established a rule that applies to Robinson and Moore in this somewhat different context, we deem it prudent to rely on our holding that Chavez's Fifth Amendment claim may not proceed in the absence of use of a coerced statement in a criminal proceeding, and so we do not reach the second prong of the qualified immunity analysis.

## III

We next turn to Chavez's claim that Moore and Robinson violated his Sixth Amendment rights by denying him counsel at a critical stage.[11]  "It is beyond dispute that '[t]he Sixth

---

[11] In his SAC, Chavez claims only that Moore and Robinson "retaliated against [him] for asserting his right to speak with a lawyer in June, 2010 before responding to the demand that he admit disputed

Amendment safeguards to an accused who faces incarceration the right to counsel at all critical stages of the criminal process.'" *Marshall v. Rodgers*, 569 U.S. 58, 62 (2013) (per curiam) (quoting *Iowa v. Tovar*, 541 U.S. 77, 80–81 (2004)). "A critical stage is a 'trial-like confrontation, in which potential substantial prejudice to the defendant's rights inheres and in which counsel may help avoid that prejudice.'" *United States v. Leonti*, 326 F.3d 1111, 1117 (9th Cir. 2003) (quoting *Beaty v. Stewart*, 303 F.3d 975, 991–92 (9th Cir. 2002)). Chavez raises two theories as to why Robinson and Moore violated his Sixth Amendment right to counsel when they denied his request to speak with his lawyer before he signed the documents admitting prior conduct as part of his treatment program.

Chavez first argues that Robinson and Moore violated his Sixth Amendment right to counsel on appeal, which is a critical stage of a criminal proceeding for purposes of the Sixth Amendment. *See Penson v. Ohio*, 488 U.S. 75, 88 (1988). Chavez's theory comprises multiple steps, and proceeds as follows. According to Chavez, consultation with an attorney about whether to appeal is a critical stage of the proceedings. Second, Chavez claims that if he admitted to the conduct underlying his conviction, and then prevailed on

---

allegations that were then pending on appeal, in violation of Chavez's Sixth Amendment right to counsel," but does not argue that Moore and Robinson's failure to allow him to speak to counsel at that time violated his Sixth Amendment right. In his opening brief, however, Chavez does not mention retaliation, but raises only a Sixth Amendment claim based on denial of counsel at a critical stage. The defendants do not address this discrepancy, so we assume that Chavez's Sixth Amendment claim is properly before us. *See Norwood v. Vance*, 591 F.3d 1062, 1068 (9th Cir. 2010) ("It is well-established that a party can waive waiver implicitly by failing to assert it." (cleaned up)).

appeal, any appeal would be futile because he would be re-convicted on retrial if his admission was not suppressed but was introduced at a retrial. Therefore, according to Chavez, consulting with a lawyer regarding whether to make an admission is analogous to consulting with a lawyer about whether to withdraw an appeal. And consulting about withdrawal, he asserts, is substantially the same as consulting with a lawyer about whether to appeal at all. As a result, Chavez argues, Robinson and Moore's refusal to allow him to consult his attorney before making admissions was in effect a complete deprivation of counsel at the critical stage of determining whether to appeal or withdraw an appeal.

This argument fails. First, no precedent supports Chavez's claim that he was denied counsel on appeal. There is no dispute that Chavez was represented by appellate counsel for his appeal and was not denied representation "during the appellate court's actual decisional process." *Penson*, 488 U.S. at 88. Nor does Chavez allege that Robinson prevented him from communicating with appellate counsel about withdrawing his appeal outside of the sex therapy treatment program. Therefore, even assuming that a decision to withdraw an appeal is a critical stage, Chavez was not denied access to counsel for that purpose. Nor does any precedent support Chavez's argument that his meeting with Robinson for sex therapy treatment was a critical stage of his appeal. Any admission made by Chavez in his sex therapy program could not *directly* affect his appeal, because it would not have been part of the trial court record on appeal. And any admission—at least to the extent it was coerced by threat of sanctions—would not affect his retrial, because it could be suppressed in any subsequent criminal proceeding. *Turley*, 414 U.S. at 78; *Garrity*, 385 U.S. at 500. Further, our precedent makes clear that "the Sixth Amendment has no

application to supervised release proceedings," *United States v. Spangle*, 626 F.3d 488, 494 (9th Cir. 2010) (citing *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)), which further undermines any claim that Chavez had a Sixth Amendment right to counsel in meetings or treatment prescribed by his supervised release conditions, *cf. Murphy*, 465 U.S. at 424 n.3 (probationer "had no federal right to have an attorney present at the meeting" with his probation officer where he was asked to make incriminating statements.).

Moreover, the case on which Chavez primarily relies, *Roe v. Flores-Ortega*, 528 U.S. 470 (2000), does not establish that a defendant is entitled to consult with counsel before making admissions in a sex offender treatment program, or that making a decision regarding this program requirement constitutes a critical stage of a criminal proceeding. In *Flores-Ortega*, a criminal defendant's counsel failed to file a timely notice of appeal, despite telling the defendant she would do so. *Id.* at 475. The Supreme Court held that there was no per se rule that such a failure constituted ineffective assistance of counsel; rather, ineffective assistance of appellate counsel due to failure to file a notice of appeal must be analyzed under the familiar two-prong test from *Strickland v. Washington*. *Id.* at 476–77 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). Applying *Strickland*, the Court spelled out the circumstances in which a counsel's failure to consult on whether to file a notice of appeal could constitute deficient performance, as well as the circumstances in which such deficient performance could be prejudicial to the defendant. *Id.* at 477–81. But contrary to Chavez's argument, *Flores-Ortega* does not establish that a defendant has a right to consult with counsel when deciding whether to "effectively forfeit" an appeal by making admissions required by the therapy program; nor does *Flores-Ortega* address the

particular situation here, where a therapist declined to allow a sex offender participating in a treatment program to consult with his appellate counsel. Chavez points to no other case that clearly establishes a right to counsel in a sex offender treatment program.

Because no existing precedent establishes that a prisoner who is prevented from contacting counsel during sex offender treatment has been denied counsel on appeal, Robinson and Moore are also entitled to qualified immunity on this claim under the second prong of the analysis. *See al-Kidd*, 563 U.S. at 735.

Chavez's second theory as to why his Sixth Amendment rights were violated due to the denial of counsel at a critical stage also fails. Chavez claims that a criminal defendant is entitled to counsel during any proceeding that could jeopardize a potential retrial. According to Chavez, this rule is clearly established by *Cahill v. Rushen*, 678 F.2d 791 (9th Cir. 1982). In *Cahill*, after a criminal defendant was convicted at trial, a police captain immediately ordered the defendant moved from the jail to the sheriff's office and interrogated him without giving him *Miranda* warnings or offering him an opportunity to speak with his attorney. *Id.* at 793. The defendant confessed to the crime for which he had been convicted, and the confession was used at a subsequent retrial. *Id.* We held that there was a deprivation of counsel at a critical stage of a criminal prosecution, because "[w]hen as here defendant's right to counsel has attached, any incriminating statements deliberately elicited by the State without at least affording defendant the opportunity to consult with counsel, must be excluded at any subsequent trial on the charges for which defendant is then under indictment." *Id.* at 795. We explained that this rule was necessary because the

practice of interviewing a criminal defendant after conviction "easily lends itself to abuse," and "may often greatly prejudice a defendant who could otherwise gain an acquittal upon retrial." *Id.* at 794 n.2.

While the rule in *Cahill* may be applicable here at some "high level of generality," *al-Kidd*, 563 U.S. at 742, the facts are too dissimilar to clearly establish a rule that Chavez was entitled to consult with counsel at the sex offender treatment program. *Cahill* involved the custodial interrogation of a defendant taken directly from jail by a police chief who deliberately elicited a confession for law enforcement purposes. 678 F.2d at 793. By contrast, a sex offender treatment program is much less of a "trial-like confrontation," *Leonti*, 326 F.3d at 1117 (citation omitted); it seeks rehabilitation, and uses confession only as a treatment strategy.[12] Moreover, while cases have discussed this typical

---

[12] Justice Kennedy's plurality opinion in *McKune v. Lile* explained why confession contributes to rehabilitation:

> Therapists and correctional officers widely agree that clinical rehabilitative programs can enable sex offenders to manage their impulses and in this way reduce recidivism. See U.S. Dept. of Justice, Nat. Institute of Corrections, A Practitioner's Guide to Treating the Incarcerated Male Sex Offender xiii (1988) ("[T]he rate of recidivism of treated sex offenders is fairly consistently estimated to be around 15%," whereas the rate of recidivism of untreated offenders has been estimated to be as high as 80%. "Even if both of these figures are exaggerated, there would still be a significant difference between treated and untreated individuals"). An important component of those rehabilitation programs requires participants to confront their past and accept responsibility for their misconduct. *Id.*, at 73. "Denial is generally regarded as a main

aspect of sex offender treatment programs in the context of Fifth Amendment rights, *see, e.g.*, *Murphy*, 465 U.S. at 422; *McKune*, 536 U.S. at 30; *Antelope*, 395 F.3d at 1137, no case has held that a sex offender is entitled to counsel while engaging in such treatment.  Thus, *Cahill* does not clearly establish the right to counsel at a sex offender treatment program.

In sum, Chavez has not identified any case holding that a convicted sex offender participating in a treatment program as a condition of probation or supervised release is entitled to counsel before complying with the requirement (typical of such programs) to admit the conduct underlying the conviction, even if such admission has the potential to prejudice a potential retrial after a successful appeal.  Given that clearly established law must be "particularized to the facts of the case," *White*, 137 S. Ct. at 552, we cannot say that Robinson and Moore were "plainly incompetent" or "knowingly violate[d] the law," *Malley*, 475 U.S. at 341.  Accordingly, Robinson and Moore are entitled to qualified

---

impediment to successful therapy," and "[t]herapists depend on offenders' truthful descriptions of events leading to past offences in order to determine which behaviours need to be targeted in therapy."  H. Barbaree, Denial and Minimization Among Sex Offenders: Assessment and Treatment Outcome, 3 Forum on Corrections Research, No. 4, p. 30 (1991). Research indicates that offenders who deny all allegations of sexual abuse are three times more likely to fail in treatment than those who admit even partial complicity. See B. Maletzky & K. McGovern, Treating the Sexual Offender 253–255 (1991).

536 U.S. at 33.

immunity on this claim.[13]  We therefore affirm the dismissal of Chavez's right-to-counsel claim.

IV

Finally, we turn to Chavez's claim that Robinson and Moore violated his First Amendment right to bring a civil lawsuit by terminating him from the sex offender treatment program and revoking his supervision in retaliation for his filing a lawsuit against them.  According to Chavez, this right is clearly established by *Rhodes v. Robinson*, 408 F.3d 559 (9th Cir. 2005), and related cases establishing that prison officials cannot punish a prisoner for filing grievances or lawsuits, *see, e.g.*, *Brodheim v. Cry*, 584 F.3d 1262, 1269–73 (9th Cir. 2009); *Rizzo v. Dawson*, 778 F.2d 527, 531–32 (9th Cir. 1985).  In *Rhodes*, prison officials brought a motion to dismiss a prisoner's § 1983 action, alleging that they retaliated against him for filing inmate grievances by, among other things, destroying and confiscating his personal property.  408 F.3d at 563.  The prison officials argued that they were entitled to qualified immunity because it was not clearly established that a prisoner has a constitutional right to be free from retaliatory conduct that does not chill or deter the exercise of the prisoner's constitutional rights, and they argued that the prisoner's repeated filings, including the § 1983 action, showed that the prisoner's First Amendment rights had not been chilled.  *Id.* at 566.

---

[13] Because we decide that it was not clearly established that Chavez had a right to counsel at his sex offender treatment program, we need not address Moore's additional argument that she did not violate Chavez's right to counsel because Chavez made the demand only to Robinson.

We held that in the prison context, the "prohibition against retaliatory punishment is 'clearly established law' in the Ninth Circuit for qualified immunity purposes." *Id*. at 569 (quoting *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995)). We explained that the First Amendment right to file prison grievances and pursue civil rights litigation in the courts is fundamentally important because "[w]ithout those bedrock constitutional guarantees, inmates would be left with no viable mechanism to remedy prison injustices." *Id.* at 567. Therefore, a prisoner can make a viable claim of First Amendment retaliation by alleging five basic elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Id.* at 567–68 (footnote omitted). The prisoner does not have to allege a "*total* chilling of his First Amendment rights to file grievances and to pursue civil rights litigation in order to perfect a retaliation claim." *Id.* at 568 (emphasis in original). *Rhodes* concluded that at the motion to dismiss stage, the prisoner had adequately satisfied the pleading requirements, and therefore the officers were not entitled to qualified immunity. *Id.* at 569–70.

There are significant distinctions between *Rhodes* and the facts alleged in the SAC. Unlike in *Rhodes*, the SAC in this case does not present a retaliatory action in a prison context, but instead alleges that Chavez is a releasee attending a sex offender treatment program. Chavez cites no case holding that a person providing rehabilitation therapy for a supervised releasee may not discharge the releasee from the program in response to a lawsuit. It is not "arbitrary and irrational" for a sex offender treatment program director, like Robinson, to

conclude that when a participant in a therapy program is adversarial, repeatedly refuses to participate in the threshold requirement for admission, and brings a legal action against the therapist, no therapeutic relationship could be developed, and therefore such a program would be ineffective in promoting a Chavez's rehabilitation. *See Brodheim*, 584 F.3d at 1272. Under these circumstances, Robinson could reasonably conclude he had a "legitimate correctional goal" in dismissing Chavez from the sex offender treatment program. *Rhodes*, 408 F.3d at 567–68. Thus, in the "specific context of th[is] case," *Keates*, 883 F.3d at 1235 (citation omitted), nothing would have given Robinson "fair notice" that his "conduct was unlawful," *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). Accordingly, Robinson is entitled to qualified immunity.

For the same reason, we conclude that Moore is entitled to qualified immunity. Once Robinson terminated Chavez from the sex offender treatment program, Chavez was no longer in compliance with the court-ordered condition of probation and supervised release. Although Chavez argues that Moore had "ready alternatives" to giving him a jail sanction that would have achieved the same penological goal (such as transferring him to a different sex offender treatment program), *see Shaw v. Murphy*, 532 U.S. 223, 228 (2001), there is no clearly established law precluding a probation officer from imposing a sanction under these circumstances.

**AFFIRMED**.

BERZON, Circuit Judge, concurring in part in the judgment and dissenting in part:

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Daniel Chavez was incarcerated for declining to admit to criminal conduct during therapy prescribed as a condition of his parole. An appeal of his conviction was pending at the time, and his concern was that if his appeal succeeded—which it did—any statement he made about the crime for which he was convicted could be used against him in a retrial.

To me, it takes no complex analysis to conclude that Chavez was "compelled in [a] criminal case" to be a witness against himself and imprisoned because he would not be, violating his Fifth Amendment rights and giving rise to a cause of action under 42 U.S.C. § 1983. The applicable precedents have taken some twists and turns, but, after working through them, I am convinced that the straightforward conclusion is the correct one: On the record viewed most favorably to Chavez, Robinson and Moore violated a well-established prohibition on incarcerating a parolee for failing to incriminate himself, recognized in *United States v. Antelope*, 395 F.3d 1128, 1139 (9th Cir. 2005); Chavez may sue for damages under 42 U.S.C. § 1983 for that violation; and Chavez's Fifth and Fourteenth Amendment claim is not barred by qualified immunity. As the majority decides otherwise, I dissent from the majority's Fifth Amendment § 1983 holding.

I also write separately to address the majority's reasoning on Chavez's Sixth Amendment claim. To the extent the majority reaches the merits (which is not clear), I disagree

with the majority's assertion that Chavez's Sixth Amendment claim fails because he had access to counsel at other stages of his appeal and because the Sixth Amendment does not apply to supervised release proceedings.   These arguments mischaracterize Chavez's claim: that he had a right to consult with counsel about waiving his Fifth Amendment privilege while his appeal was still pending.   I agree, however, that there is no clearly established law on whether Chavez had a right to consult with counsel under the circumstances, and so concur in holding that Chavez's Sixth Amendment claim is barred by qualified immunity.[1]

## I.   Self-Incrimination

Again, the self-incrimination language of the Fifth Amendment (which is incorporated to the states via the Fourteenth Amendment, *Malloy v. Hogan*, 378 U.S. 1, 6 (1964)), guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."   U.S. Const. amend. V.   "The constitutional privilege against self-incrimination has two primary interrelated facets: The Government may not use compulsion to elicit self-incriminating statements, and the Government may not permit the use in a criminal trial of self-incriminating statements elicited by compulsion."   *Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52, 57 n.6 (1964) (citation omitted), *overruled on other grounds by United States v. Balsys*, 524 U.S. 666, 684, 688 & n.11 (1998) (abrogating *Waterfront Commission* to the extent it relied on historical analysis for a more expansive interpretation of the Self-

---

[1] I concur in the majority's resolution of Chavez's First Amendment § 1983 claim.

Incrimination Clause).**²**  The second facet of this guarantee is protected by a set of procedural safeguards ensuring that, when an individual *does* give self-incriminating testimony in non-criminal proceedings in response to government compulsion, that testimony may not be admitted in any related criminal proceedings.  *See Chavez v. Martinez*, 538 U.S. 760, 770–71 (2003) (plurality opinion).  As the majority ably demonstrates, our circuit's interpretation of *Chavez* does not allow for a cause of action under § 1983 where an individual gives self-incriminating statements outside of a criminal proceeding.  *See Aguilera v. Baca*, 510 F.3d 1161, 1174 n.9 (9th Cir. 2007).

But this rule does not control where the privilege *is* invoked, no statement is given, and the individual suffers punishment as a consequence—here, the classic punishment of incarceration.  First, long-standing Supreme Court law makes clear that the compulsion itself is of constitutional significance.  *See Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977).  Second, a case from this court nearly identical to this one, *United States v. Antelope*, holds that the Fifth Amendment *was* violated by compulsion, although there was no use of a compelled statement in a criminal proceeding. *See* 395 F.3d at 1134–39.  Third, the actual holding of the *Chavez* case has no application in these circumstances, and the language that the majority relies upon in the *Chavez* opinions as reaching the present circumstances is not binding. *See infra*, pp. 54–56; *Tekoh v. County of Los Angeles*,

---

**²** *Waterfront Commission* says "criminal trial," but the amendment itself says "criminal case."  Consistent with the text, case law has made clear that the self-incrimination protection applies to aspects of criminal proceedings other than trial.  *See Stoot v. City of Everett*, 582 F.3d 910, 925 (9th Cir. 2009).

985 F.3d 713, 722 (9th Cir. 2021). And finally, no binding case law of the Supreme Court or of this court bars a § 1983 cause of action seeking damages for the revocation of supervised release and incarceration as violative of the Fifth Amendment's prohibition against compulsion, and both Supreme Court case law and policy considerations support such a cause of action.

### a. The Scope of the Privilege

Chavez was told that if he did not admit to the criminal conduct underlying his conviction during prescribed therapy sessions, his supervised release would be revoked. He refused to incriminate himself and was immediately jailed, three times. The first two times this happened, he was not offered immunity for any retrial or other future criminal proceedings. As Chavez was detained immediately after he refused to incriminate himself, *see infra* p. 61 n.3, he had no opportunity to seek immunity from a judge. So: Chavez was punished—compelled (by jail time) for refusing to be a witness against himself (by admitting to the underlying criminal conduct), with his criminal case not concluded and a retrial possible.

At its most fundamental, the Fifth Amendment

> not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also "privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."

*Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)). This right is meaningless if the state may incarcerate individuals for refusing to incriminate themselves. The Supreme Court has long recognized that the Fifth Amendment, incorporated to the states via the Fourteenth Amendment, "secures . . . the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and *to suffer no penalty . . . for such silence.*" *Malloy*, 378 U.S. at 8 (emphasis added). Governments therefore may not "penalize assertion of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony which has not been immunized," *Cunningham*, 431 U.S. at 806, nor does the Fifth Amendment permit law enforcement officers to use threats of harsh treatment to compel self-incrimination by criminal defendants, *see Tobias v. Arteaga*, 996 F.3d 571, 582 (2021).

Threatened imprisonment is a quintessential "penalt[y] capable of forcing the self-incrimination which the Amendment forbids." *Cunningham*, 431 U.S. at 806. The protection guaranteed by the Self-Incrimination Clause therefore "forbids the States to resort to imprisonment . . . to compel [someone] to answer questions that might incriminate him." *Malloy*, 378 U.S. at 8. Likewise, "there are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment." *Tobias*, 996 F.3d at 582 (quoting *United States v. Harrison*, 34 F.3d 886, 891–92 (9th Cir. 1994)). This logic applies with equal force in the probation context: "[I]f the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic

penalty situation." *Murphy*, 465 U.S. at 435; *see Antelope*, 395 F.3d at 1138 n.4.

Nor is the prohibition on penalizing the refusal to self-incriminate limited to threats of incarceration. *Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation*, 392 U.S. 280 (1968), held that the state of New York violated the Fifth Amendment when it terminated public employees for "invoking and refusing to waive their constitutional right against self-incrimination." *Id.* at 283; *accord Garrity v. New Jersey*, 385 U.S. 493, 497 (1967). *Turley* likewise held that architects suffered constitutional injury when they were disqualified from contracting with the state as punishment for refusing to self-incriminate. *See* 414 U.S. at 82–83. And *Cunningham* recognized that requiring an official in a state political party to relinquish his public office constituted unconstitutional compulsion. *See* 431 U.S. at 807.

In these latter cases, "the attempt to override the witnesses' privilege proved unsuccessful," and no coerced statement was ever made or admitted. *Murphy*, 465 U.S. at 434. Nonetheless, "the Court ruled that the State could not constitutionally make good on its prior threat" of penalty. *Id.* It was the coercive acts themselves—the *acts of compulsion*—that triggered protection under the Fifth Amendment. *See Cunningham*, 431 U.S. at 803–04; *Turley*, 414 U.S. at 76; *Uniformed Sanitation Men*, 392 U.S. at 283. So these cases demonstrate that the constitutional prohibition against "compel[ling] a [person] to speak about his past crimes despite a desire to remain silent," *McKune v. Lile*, 536 U.S. 24, 36 (2002) (plurality opinion), forbids acts of compulsion—and most especially incarceration—where, as here, there is a pending criminal proceeding and no promise

that any statements made will not be used during that proceeding.

We held exactly that in *United States v. Antelope*. *Antelope* considered near-identical facts to this one: A plaintiff released from prison on supervised release was required, as a condition of his mandated treatment program, to detail his sexual history without any assurance of immunity. 395 F.3d at 1130. He repeatedly refused; in response, the government revoked his supervised release and incarcerated him. *Id.* On direct appeal of the revocation, Antelope asserted that the government's conduct violated his right against compelled self-incrimination. *Id.* at 1131–32. We agreed, holding that Antelope had established a Fifth Amendment violation by showing that "(1) that the testimony desired by the government carried the risk of incrimination, and (2) that the penalty he suffered"—incarceration— "amounted to compulsion." *Id.* at 1134 (citations omitted). Notably, as here, Antelope did not make any incriminating statement, and so the case did not concern the invocation of an evidentiary privilege during a criminal proceeding.

For its holding, *Antelope* relied heavily on the Supreme Court's reasoning in *McKune v. Lile*, which *Antelope* read as prohibiting the government from revoking supervised release as a result of a defendant's "refusal to disclose his sexual history without receiving immunity from prosecution." *Id.* at 1139; *see id.* at 1135–39. *McKune* concerned a § 1983 challenge to a sexual abuse treatment program administered in a Kansas prison. 536 U.S. at 30–31 (plurality opinion). Participants in the program were required to "detail[] all prior sexual activities"; providing this information was not immunized. *Id.* at 30, 34. Participants who refused to participate in the program had their privileges reduced,

received curtailed "visitation rights, earnings, work opportunities, . . . and other privileges," and were advised they would be transferred to a higher-security unit. *Id.* at 30–31.

A fractured Court held that the program did not violate the Fifth Amendment, but *only* on the ground that the consequences of silence—"transfer to another prison where television sets are not placed in each inmate's cell, where exercise facilities are not readily available, and where work and wage opportunities are more limited"—were not severe enough to rise to the level of compulsion. *Id.* at 36; *see id.* at 48–49 (O'Connor, J., concurring in the judgment). There was no majority opinion regarding the standard applicable when evaluating what conduct constitutes compulsion. *See id.* at 48. But Justice Kennedy's plurality opinion, which proposed the most demanding standard, acknowledged that the outcome might be different if the decision not to participate in the treatment program resulted in a longer prison sentence. *See id.* at 38 (plurality opinion). And Justice O'Connor's concurrence, which *Antelope* held is controlling, *see* 395 F.3d at 1133 n.1, likewise noted that "longer incarceration" imposes a penalty "far greater than those we have already held to constitute unconstitutional compulsion," *McKune*, 536 U.S. at 52 (O'Connor, J., concurring in the judgment).

As *Antelope* held, *Chavez v. Martinez* is not to the contrary. *See* 395 F.3d at 1140. Two opinions in *Chavez*, together subscribed to by a majority of the justices, distinguish between core Fifth Amendment rights and "prophylactic" protections of those rights. *See* 538 U.S. at 770 (plurality opinion); *see also id.* at 777–78 (Souter, J., concurring in the judgment). But that case did not "unseat

decades of Supreme Court law" holding that penalties for invoking the privilege against self-incrimination violate the Fifth Amendment. *Antelope*, 395 F.3d at 1140. To the contrary, Justice Thomas's plurality opinion in *Chavez* recognized that "no 'penalty' may ever be imposed on someone who exercises his core Fifth Amendment right not to be a 'witness' against himself in a criminal case," while drawing on the Supreme Court's line of penalty cases. 538 U.S. at 768–69 (plurality opinion). And Justice Souter recognized that the holding of those penalty cases was necessary "to protect the basic right" against self-incrimination. *Id.* at 777–78 (Souter, J., concurring in the judgment). Rather than limit the scope of the Fifth Amendment's protections, *Chavez* concerned the scope of § 1983's affirmative action for damages arising out of a violation of those protections. *See Antelope*, 395 F.3d at 1141. It is to this question that I now turn.

### b. The Scope of § 1983 Liability

The majority maintains that, despite the square holding of *Antelope* that a parole revocation and imprisonment for refusing to make non-immunized incriminatory statements is impermissible under the Fifth Amendment, *Chavez v. Martinez* does not permit an affirmative action in damages for that impermissible compulsion. I disagree.

### i.

First, there is no controlling opinion in *Chavez* regarding whether § 1983 actions are available in such circumstances. This circuit recently held that "none of the six opinions [in *Chavez*] provides a binding rationale," and specifically that "Justice Thomas's plurality . . . cannot control." *Tekoh*,

985 F.3d at 722. In so holding, *Tekoh* applied the analysis set out in *United States v. Davis*, 825 F.3d 1014 (9th Cir. 2016) (en banc), for determining what rule we apply when faced with "fractured Supreme Court decision[s]," *id.* at 1021–22. Under *Davis*, we are bound by such decisions only to the extent that "a majority of the Justices agree upon a single underlying rationale and one opinion can reasonably be described as a logical subset of the other." *Id.* at 1022. Where no such "common denominator of the Court's reasoning exists, we are bound only by the specific result." *Id.* at 1028 (internal quotation marks omitted).

In *Chavez*, Justice Thomas's narrower view of the scope of the Fifth Amendment reflected a "rationale significantly broader than those of the concurring Justices." *Tekoh*, 985 F.3d at 722. Justice Thomas broadly maintained that "violations of 'judicially crafted prophylactic rules do not violate the constitutional rights of any person' and therefore 'cannot be grounds for a § 1983 action.'" *Id.* at 721 (quoting *Chavez*, 538 U.S. at 772 (plurality opinion)). Justice Souter, by contrast, agreed that civil liability was inappropriate in *Chavez*, but he would *not* have held, as Justice Thomas did, that enforcement of the right against self-incrimination was limited to evidentiary exclusion. *Chavez*, 538 U.S. at 777–78 (Souter, J., concurring in the judgment).

Rather, Justice Souter explained that the Supreme Court's penalty cases "express[] a judgment that the [Fifth Amendment's] core guarantee, or the judicial capacity to protect it, would be placed at some risk in the absence of [the] complementary protection[s]" those cases recognized. *Id.* at 778. Although he noted that recognizing a § 1983 cause of action absent the "courtroom use of a criminal defendant's compelled, self-incriminating testimony" would "be well

outside the core of Fifth Amendment protection," Justice Souter rejected the plurality's position that "that alone" was "a sufficient reason to reject Martinez's claim," *id.* at 777, and concluded only that, in the *Chavez* case before the court—in which the Fifth Amendment violation consisted of "questioning alone"—Martinez could not "make the 'powerful showing,' subject to a realistic assessment of costs and risks, necessary to expand protection of the privilege against compelled self-incrimination to the point of" civil liability, *id.* at 777–78 (quoting *Miranda v. Arizona*, 384 U.S. 436, 515, 517 (1966) (Harlan, J., dissenting)).

In Justice Souter's view, then, the availability of a § 1983 claim depends on whether such a rule is "necessary in aid of the basic guarantee" of the Fifth Amendment privilege. *Id.* at 779. And, contrary to Justice Thomas's assertion that a violation of the Fifth Amendment absent courtroom use of inadmissible statements could *never* be the basis for a § 1983 claim, Justice Souter did not suggest that such a claim would be unavailable where there is an "imposition[] of[ a] penalt[y] that would undermine the right to immunity." *Id.* at 778 (citing *Uniformed Sanitation Men*, 392 U.S. at 284–85; *Turley*, 414 U.S. at 77–79; *Cunningham*, 431 U.S. at 804–06; *McKune*, 536 U.S. at 35 (plurality opinion)). Thus, as in *Tekoh*, there is *no* controlling opinion in *Chavez* regarding the availability of § 1983 under the present circumstances. *See Tekoh*, 985 F.3d at 722.

To be sure, *Antelope* recognized that, after *Chavez*, it is sometimes appropriate to distinguish "defensive" Fifth Amendment challenges from an affirmative action brought under § 1983. *See Antelope*, 395 F.3d at 1141. But *Antelope* did not resolve whether § 1983 liability would attach to a claim arising out of the constitutional violation recognized in

that case. The opinion noted only that the government "might" prevail in such a posture; it did not hold that it *would*. *Id.* There is therefore no controlling precedent, either from the Supreme Court or this circuit, directly resolving the § 1983 availability question before us now.

The majority recognizes *Tekoh*'s holding that "none of the six separate opinions in *Chavez* 'provides a binding rationale,'" Maj. Op. at 21 (quoting *Tekoh*, 985 F.3d at 722), yet it resists the conclusion that follows—that "the broad principles in Justice Thomas's opinion are not binding," *Tekoh*, 985 F.3d at 722. Instead, the majority relies on cases which it maintains have read *Chavez* to stand for the proposition that "mere coercion does not violate the text of the Self-Incrimination Clause absent use of the compelled statements in a criminal case against the witness." *Aguilera*, 510 F.3d at 1173 (quoting *Chavez*, 538 U.S. at 769). The cases the majority cites, however, predate our analysis in *Tekoh*, which held conclusively that "none of the six opinions [in *Chavez*] provides a binding rationale." *Tekoh*, 985 F.3d at 722. Indeed, the majority's cases did not analyze *Chavez* under *Davis* or *Marks v. United States*, 430 U.S. 188 (1977), the Supreme Court case *Davis* interpreted. *Tekoh* undertook that analysis for the first time in our circuit, rendering any reliance on Justice Thomas's plurality opinion as binding no longer good law.

Moreover, none of the cases cited by the majority addressed the set of circumstances at issue here, in which the plaintiff invoked his Fifth Amendment privilege during the pendency of a criminal proceeding and was punished for doing so. In *Aguilera*, law enforcement deputies were threatened with "re-assignment from field to desk duty" for declining to answer questions about possible misconduct.

510 F.3d at 1173; *see id.* at 1172. We dismissed the deputies' § 1983 claim in large part on the ground that the plaintiffs had failed to show compulsion. *See id.* at 1173. We further stated that "the deputies' Fifth Amendment claim . . . fails because the deputies were never charged with a crime, and no incriminating use of their statements has ever been made." *Id.* Unlike the deputies in *Aguilera*, Chavez *was* charged with a crime and was in the midst of an active appeal. *Aguilera* is therefore inapposite.

The majority's reliance on *Stoot v. City of Everett*, 582 F.3d 910 (9th Cir. 2009), is misplaced as well. There, we addressed a § 1983 claim for a violation of the plaintiff's Fifth Amendment privilege after a state court had suppressed the plaintiff's confession as "the product of impermissible coercion." *Id.* at 917. Citing *Chavez*, we noted that "coercive police questioning does not violate the Fifth Amendment, absent use of the statements in a criminal case." *Id.* at 923. But, like *Chavez* itself, *Stoot* involved impermissible "questioning alone." *Chavez*, 538 U.S. at 777 (Souter, J., concurring in the judgment). We had no occasion to decide in *Stoot* whether a § 1983 cause of action exists when a plaintiff is actually *punished* for invoking his Fifth Amendment privilege. Nor did we address that question in *United States v. Hulen*, 879 F.3d 1015 (9th Cir. 2018), which assessed whether a proceeding to revoke supervised release constitutes a criminal case, not the imposition of punishment for the invocation of the Fifth Amendment privilege, *id.* at 1017–21.

Once one considers only the "specific result" in *Chavez* as precedential, *see Tekoh*, 985 F.3d at 722 (quoting *Davis*, 825 F.3d at 1028), the majority's holding loses any tether to the Fifth Amendment or to § 1983 jurisprudence. The

"specific result" in *Chavez* does not govern this case because, unlike Daniel Chavez here, the plaintiff in *Chavez* was never charged with a crime, nor was he penalized for declining to incriminate himself. *See* 538 U.S. at 764. And, as my earlier discussion indicates, incarcerating the petitioner here for refusing to incriminate himself while his direct appeal was pending violates long-standing precedent concerning the scope of the Fifth Amendment's protections against *compelling* individuals to incriminate themselves, whether one terms some of those protections "prophylactic" and others "core" or not. As in *Antelope*, "whether we describe [the] decision as arising out of a 'prophylactic' or 'constitutional' rule, the same result obtains: [Chavez] followed the appropriate course of action by refusing to answer the sexual history question until he was assured that his answers would be protected by immunity." 395 F.3d at 1141.

### ii.

As neither *Chavez* nor *Antelope* squarely decides whether § 1983 liability attaches to a scenario in which an individual has suffered a coercive penalty—here, incarceration—for refusing to incriminate himself, we turn to *McKune v. Lile*, in which the Supreme Court considered an almost identical question. As discussed *supra*, *McKune* and this case share key facts. Like the plaintiff in *McKune*, Chavez was required to share details of his sexual history as part of a court-imposed sexual abuse treatment program and faced adverse consequences for refusing to do so. But unlike the plaintiffs in *McKune*, who were already incarcerated and faced a penalty of reduced prison privileges and transfer to a higher-security facility, 536 U.S. at 31 (plurality opinion), Chavez, who entered his treatment program on supervised release, was

immediately incarcerated for declining to share those details. Put simply, Chavez was jailed for refusing to incriminate himself. So, while *McKune* held that no § 1983 action was available to the plaintiffs because the relevant penalties were not severe enough to rise to the level of compulsion, *id.* at 36; *see id.* at 48–49 (O'Connor, J., concurring in the judgment), the penalty faced by Chavez in this case—incarceration—is precisely the type all nine justices in *McKune* indicated would amount to impermissible compulsion. *See id.*

Crucially, no opinion in *McKune* intimated that the plaintiff's action under § 1983 for violation of his Fifth Amendment self-incrimination privilege failed because, as here, no incriminating statements were made and so no incriminating statements were introduced in any criminal proceeding. The alleged harm suffered by the plaintiff in *McKune* was a penalty for his silence, not adverse consequences at trial; the § 1983 suit failed because there was no compulsion for Fifth Amendment purposes, not because no incriminating statement was sought to be introduced at trial. *McKune* therefore is fully consistent with holding that a § 1983 cause of action is available to Chavez here.

Moreover, this case decidedly does not present the danger identified in Justice Souter's *Chavez* concurrence that, if we were to recognize possible liability, § 1983 would in the future apply "in every instance of interrogation producing a statement inadmissible under Fifth or Fourteenth Amendment principles." 538 U.S. at 778 (Souter, J., concurring in the judgment). At the end of the day, the plaintiff in *Chavez* suffered no constitutional injury: He was never charged with a crime, *id.* at 764 (plurality opinion), and although his medical condition when questioned by law enforcement may have made the interrogation coercive, he was neither

penalized nor threatened with a penalty for refusing to self-incriminate, nor was he harmed by the admission of incriminating evidence at trial. Even if recognizing a cause of action in cases like *Chavez* would "offer[] no limiting principle" to civil liability for alleged Fifth Amendment cases, *id.* at 779 (Souter, J., concurring), this is not such a case. Here, unlike in *Chavez*, the plaintiff was the subject of an ongoing criminal appeal, and *was* actually incarcerated for declining to incriminate himself. Recognizing a § 1983 cause of action under these circumstances would not expose the government to liability "in every instance" in which an involuntary confession is obtained. *Id.* at 778. Rather, under the logic articulated in Justice Souter's concurrence, Chavez has made a "powerful showing," that his "core guarantee, or the judicial capacity to protect it," was violated. *Id.* at 778.[3]

---

[3] The majority asserts that Chavez "could have sought protection from government sanctions in other ways," such as by demanding immunity before making any incriminating statements or by appealing the revocation of his supervised release. Maj. Op. at 29 & n.8. This suggestion is belied by the record. Chavez explained in exhibits to his original complaint that the moment he refused to incriminate himself, he "was immediately apprehended, handcuffed and taken to jail," where he was "detained without bail," and he relied on that assertion in his opening brief on appeal. The majority maintains that this allegation should be ignored because, it contends, Chavez did not reattach these exhibits to his Second Amended Complaint. *Id.* at 31 n.8. But the district court repeatedly cited the docket entry containing the exhibits to the original complaint in its order dismissing Chavez's Second Amended Complaint. In particular, the district court considered the "Violation and Structured Sanction Reporting Form," filled out by Moore with regard to Chavez's third incarceration. That form establishes that Chavez's "[c]ustody" began on March 10—the date he refused to participate in his therapy—even though the sanction was not officially imposed until March 22, presumably after a hearing before the State Board of Parole and Post-Prison Supervision. So, these

Thus, even though, as we recognized in *Antelope*, the "scope of the Fifth Amendment's efficacy is narrower when used as a sword in a civil suit than when used as a shield against criminal prosecution," 395 F.3d at 1141, this case comes within that scope.

In sum, defendants Robinson and Moore violated Chavez's "right . . . to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." *Malloy*, 378 U.S. at 8. Recognizing a cause of action under § 1983 for this conduct would not impermissibly expand civil liability beyond that needed to preserve a meaningful Fifth Amendment protection where (1) there is a pending criminal proceeding as to which the compelled statements may be pertinent; (2) there was no assurance of immunity in that proceeding and no opportunity to obtain that assurance; and (3) the plaintiff invoked his Fifth Amendment privilege and was actually imprisoned. In these narrow circumstances, I would hold that Chavez has stated a claim for damages under § 1983.

### c.  Qualified Immunity

Once it is established that Chavez has a cause of action under § 1983, it is clear that his claim is not barred by qualified immunity: *Antelope* "clearly established" the constitutional right that Chavez alleges was violated. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Again, *Antelope* held that "revok[ing] . . . supervised release as a result of [a

---

documents show that, at best, the alternatives suggested by the majority could only have limited—not eliminated—the period of Chavez's renewed incarceration.

criminal defendant's] refusal to disclose his sexual history without receiving immunity from prosecution . . . violate[s] his Fifth Amendment right against self-incrimination." 395 F.3d at 1139; *see also Murphy*, 465 U.S. at 435. That is precisely what happened here. Chavez and was told to "admit or go to jail." When he declined to give details of his sexual history, he was, as promised, sent to jail. He was not offered immunity until after his second jail sanction, and he had until then no realistic opportunity to seek it. Any "representation that Chavez *would be* given immunity" prior to that point, Maj. Op. at 35 (emphasis added), is irrelevant; at the time he invoked his Fifth Amendment rights, Chavez had neither been offered nor "receiv[ed] immunity from prosecution," *Antelope*, 395 F.3d at 1139. As *Antelope*'s holding directly controls, there is "clearly established law [that is] 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). I would therefore hold that Chavez's Fifth Amendment claim may proceed.

## II. Right to Counsel

With respect to Chavez's Sixth Amendment claim, it is not altogether clear whether the majority has ruled only that the claim is barred by qualified immunity or has instead reached the merits of the Sixth Amendment issue. To the extent the majority decides this question only on the grounds of qualified immunity, I agree that Chavez's Sixth Amendment claim (incorporated to the states via the Fourteenth Amendment, *Douglas v. California*, 372 U.S. 353, 356–57 (1963)), is barred by qualified immunity, because it remains an open question whether Chavez was denied access to counsel at a "critical stage" of his case. But to the extent

that the majority indicates Chavez was not "denied counsel on appeal" because he had access to counsel at other stages of his appeal or because the Sixth Amendment does not apply to supervised release proceedings, Maj. Op. at 38–40, the majority misconstrues the nature of Chavez's claim and of the Sixth Amendment's protections. I would therefore affirm on the Sixth Amendment issue only, and explicitly, on the ground that Chavez has not alleged a violation of a clearly established constitutional rule.

Chavez asserts that Robinson and Moore violated his right to counsel by refusing to allow him to consult with his attorney when he was forced to decide whether to admit to his crimes as a part of his treatment program. Chavez contends that, because defendants forced him to "admit or go to jail," and admitting to the conduct underlying his convictions would have decimated his chances of winning a retrial, making it "pointless to pursue an appeal," he was effectively deprived of his right to be represented at a critical stage of his appeal—the decision whether to continue or to abandon his appeal.

"[T]he right to be represented by counsel is among the most fundamental of rights." *Penson v. Ohio*, 488 U.S. 75, 84 (1988). This right "applies at all critical stages of prosecution," *United States v. Rice*, 776 F.3d 1021, 1024 (9th Cir. 2015) (citing *Marshall v. Rodgers*, 569 U.S. 58, 62 (2013) (per curiam)), including on appeal, *see Douglas*, 372 U.S. at 356–57. The majority nevertheless appears to reject Chavez's Sixth Amendment claim on the grounds that he had counsel "during the appellate court's actual decisional process," Maj. Op. at 38 (quoting *Penson*, 488 U.S. at 88), and that he was not directly denied access to counsel for the

purpose of deciding "outside of the sex treatment therapy program" whether to withdraw his appeal, *id.*

These analyses misunderstand both our Sixth Amendment case law and Chavez's claim. To start, Chavez's claim is that he was denied the right to consult with his counsel at a particularly critical moment—when Robinson and Moore demanded that he waive his Fifth Amendment privilege and make incriminating admissions regarding the conduct underlying his convictions. It is immaterial to that claim that he had access to counsel at other points during his appeal. The question, rather, is whether Chavez was denied counsel at *a* "critical stage" of prosecution—any step of a criminal proceeding "that h[olds] significant consequences for the accused." *Bell v. Cone*, 535 U.S. 685, 695–96 (2002).

That Chavez was represented "during the appellate court's actual decisional process," *Penson*, 488 U.S. at 88, is not dispositive of that question. The right to counsel applies "at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *United States v. Hamilton*, 391 F.3d 1066, 1070 (9th Cir. 2004) (quoting *United States v. Wade*, 388 U.S. 218, 226 (1967)). Both the Supreme Court and this Circuit have faithfully applied this principle to various discrete phases of criminal proceedings, holding *inter alia* that a defendant's Sixth Amendment rights are implicated when he is denied access to counsel: during overnight recess, *Geders v. United States*, 425 U.S. 80, 90–91 (1976); during jury deliberations, *Musladin v. Lamarque*, 555 F.3d 830, 835, 842 (9th Cir. 2009); and at closing argument, *Herring v. New York*, 422 U.S. 853, 864–65 (1975); *see also Missouri v. Frye*, 566 U.S. 134, 140 (2012) (collecting examples). To suggest that Chavez was not

denied counsel in *one* critical phase of his appeal because he had counsel in *another* critical phase of his appeal flies in the face of these cases.

Nor does it matter to Chavez's Sixth Amendment claim that he had the opportunity outside the mandated treatment program to communicate with counsel about withdrawing his appeal. *See* Maj. Op. at 38. Chavez does not argue that he was generally prevented from consulting with counsel about bringing or withdrawing his appeal. To the contrary, Chavez's point is that waiving his Fifth Amendment privilege and confessing to the conduct underlying his conviction while his appeal was still pending would have had the same effect as withdrawing his appeal. Such a waiver and confession might "make it pointless to pursue an appeal" by rendering any possible retrial "a mere formality," *Cahill v. Rushen*, 678 F.2d 791, 795 (9th Cir. 1982), and so constitutes a "critical stage" of the prosecution to the same degree as does a discussion about whether procedurally to withdraw an appeal, *id.*

The majority further contends that, because "the Sixth Amendment has no application to supervised release proceedings," Chavez accordingly had no "right to counsel in meetings or treatment prescribed by his supervised release conditions." Maj. Op. at 38–39 (first quoting *United States v. Spangle*, 626 F.3d 488, 494 (9th Cir. 2010); and then citing *Murphy*, 465 U.S. at 424 n.3). That statement of law is true but irrelevant. Chavez does not claim that he generally has "a right to counsel in a sex offender treatment program." Maj. Op. at 40. He claims only a specific right—to consult with his counsel about the implications of waiving his Fifth Amendment privilege on his pending appeal and possible retrial.

True, the fact that Chavez was in a sex offender treatment program enabled Robinson and Moore to invoke the coercive pressure of imprisonment to attempt to extract his confession. But the reason Chavez was in a "critical stage" of his prosecution was not because he was in a sex offender treatment program but rather because waiving his privilege would "h[old] significant consequences for" his likelihood of success on appeal and retrial. *Cone*, 535 U.S. at 695–96.

For that reason, the majority's invocation of *United States v. Spangle*, 626 F.3d 488 (9th Cir. 2010), is beside the point. In *Spangle*, we held that the Sixth Amendment did not apply to supervised release proceedings because such proceedings are "indistinguishable from the revocation of parole." 626 F.3d at 494. Specifically, we relied on the Supreme Court's holding in *Morrissey v. Brewer*, 408 U.S. 471 (1972), that the Sixth Amendment does not apply to the revocation of parole because "revocation of parole is not part of a criminal prosecution." *Spangle*, 626 F.3d at 494 (quoting *Morrissey*, 408 U.S. at 480). By contrast, Chavez claims here that the Sixth Amendment applied precisely because of the effect waiving his Fifth Amendment privilege would have on his appeal and potential retrial, both undoubtedly "part of a criminal prosecution." *See Penson*, 488 U.S. at 88 (appeal); *Cahill*, 678 F.2d at 795 (retrial). *Minnesota v. Murphy*, 465 U.S. 420 (1984), is likewise inapposite because, in that case as well, there was no pending prosecution or appeal as to which the potential invocation of the right against self-incrimination, including the possibility of seeking judicial immunity, was pertinent, *see id.* at 422–25 & n.3.

*Spangle*, *Morrissey*, and *Murphy*, then, stand only for the proposition that probation or supervised release proceedings do not in and of themselves trigger the Sixth Amendment

right to counsel. It says nothing about the right to consult counsel before being compelled to waive the Fifth Amendment privilege *during a pending appeal*, when that could render the entire appeal an exercise in futility.

Whether Chavez was denied counsel at a "critical stage" of his appeal when he was not permitted to consult with his attorney about whether to make the potentially self-incriminating statements is therefore an open question on the merits. As "[a]ny amount of additional jail time has Sixth Amendment significance," *Frye*, 566 U.S. at 147 (alterations omitted) (quoting *Glover v. United States*, 531 U.S. 198, 203 (2001)), I believe it likely that he was. Nonetheless, it is not necessary for us to conduct this fact-specific analysis here, because, as the majority explains, neither *Roe v. Flores-Ortega*, 528 U.S. 470 (2000), nor *Cahill v. Rushen*, 678 F.2d 791 (9th Cir. 1982), clearly establishes the right Chavez asserts, and thus his right-to-counsel claim is foreclosed by qualified immunity. I write separately, however, to emphasize that Chavez's right-to-counsel claim is foreclosed on this ground *only*. Neither the fact that he had counsel at other stages of his appeal nor the fact that the Sixth Amendment is inapplicable to supervised release proceedings has any bearing on his claim.

For the foregoing reasons, I respectfully concur in the judgment as to the Sixth Amendment qualified immunity issue but dissent with regard to the Fifth Amendment § 1983 issue and the majority's reasoning on the Sixth Amendment question.